UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| RITA M. NELSON<br>(Social Security No. XXX-XX-7493),<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE, Commissioner<br>of Social Security Administration,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)        3:09-cv-91-WGH-RLY<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM DECISION AND ORDER

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 6, 10) and an Order of Reference entered by Chief District Judge Richard L. Young on September 22, 2009 (Docket No. 11).

### I.  Statement of the Case

Plaintiff, Rita M. Nelson, seeks judicial review of the final decision of the agency, which found her not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act").  42 U.S.C. §§ 416(i), 423(d); 20 C.F.R. § 404.1520(f).  The court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

Plaintiff applied for DIB on June 28, 2005, alleging disability since December 29, 2004.  (R. 11, 48-50).  The agency denied Plaintiff's application

both initially and on reconsideration.  (R. 33-35, 37-41).  Plaintiff appeared and testified at a hearing before Administrative Law Judge William Hafer ("ALJ") on August 1, 2007.  (R. 247-66).  Plaintiff was represented by an attorney; also testifying was a vocational expert.  (R. 247).  On October 23, 2007, the ALJ issued his opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform her past work as a scheduler and records clerk.  (R. 11-20).  The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner.  (R. 2-4).  20 C.F.R. §§ 404.955(a), 404.981.  Plaintiff then filed a Complaint on July 14, 2009, seeking judicial review of the ALJ's decision.

## II.  Statement of the Facts

### A.  Vocational Profile

Born on April 9, 1952, Plaintiff was 55 years old at the time of the ALJ's decision, with some college education.  (R. 20, 48, 252).  Her past relevant work experience included jobs as physical therapy aid (medium, semi-skilled), medical records clerk (light, semi-skilled), and scheduler (sedentary).  (R. 19).

### B.  Medical Evidence

#### 1.  Plaintiff's Impairments

Between February 2005 and May 2007, Plaintiff was seen periodically at Tulip Tree Family Health Center ("Tulip Tree").  (R. 114-40).  She was initially seen on February 9, 2005, when it was noted that she was being treated for depression, anxiety, and mild COPD.  (R. 137).  It was noted that Plaintiff wished

to increase her dose of Zoloft to treat her depression.  (R. 137).  During the subsequent visits to Tulip Tree, she generally complained of pain in her left hip and problems breathing; her psychiatric condition was generally reported to be normal (*see, e.g.*, R. 115, 117, 118), although, she did, at times, present with a flat affect (R. 121, 123).  Plaintiff was advised to quit smoking in November 2006 and January and March 2007.  (R. 117, 119, 121).

Robert L. Wilson, Ed.D., performed a mental status examination of Plaintiff on August 18, 2005, at the request of the State agency.  (R. 203-06).  Dr. Wilson remarked that Plaintiff appeared to be quite depressed, with a flat affect, occasional tearfulness, and "virtually no eye contact."  (R. 203).  She said that her main reason for applying for benefits was her COPD.  (R. 203).  Plaintiff stated she had always been a little depressed and that she did not sleep well.  Plaintiff also indicated that she uses two inhalers and a breathing machine.  (R. 203).  She said that she could not afford mental health treatment and was not eligible for care at the local mental health center because of her husband's income.  (R. 204).  Plaintiff told Dr. Wilson that she put off her daily activities as much as she could, but she eventually took care of the household chore routine.  (R. 204).  She said that she took walks and cared for flowers, but she got dizzy when she bent over.  (R. 204).  She said that she did not socialize much, but her interpersonal relations were okay.  (R. 204).  She was unable to interpret the proverb, "Don't cry over spilled milk," but memory and calculation testing were generally normal.  (R. 205).  A serial-seven task was a challenge for her.  (R.

205).  Dr. Wilson diagnosed major depressive disorder, moderate, and assigned Plaintiff a global assessment of functioning ("GAF") score of 41[1].  (R. 206).

On September 10, 2005, Plaintiff was seen by Evelyn Bose, M.D., for a consultative examination.  (R. 193-201).  Plaintiff's chief complaints were COPD, degenerative joint disease, and depression.  (R. 198).  Plaintiff told Dr. Bose that she had stopped working because of a "conflict of interests."  (R. 198).  She said that she had never been hospitalized for COPD; she had smoked three packs of cigarettes a day for 40 years, but she was trying to cut down, currently smoking 10 cigarettes a day.  (R. 198).  Plaintiff said she had degenerative joint disease, which caused back pain that was not always relieved by taking Tylenol.  (R. 198).  Plaintiff said that she had experienced depression for many years, but had not seen a psychiatrist for five years and was not currently taking any psychiatric medications because she could not afford them.  (R. 198).  She said that she had used her husband's Zoloft in the past, but the medication did not help her.  (R. 198).  Plaintiff complained of shortness of breath on exertion, but she said that this symptom was relieved with use of an albuterol inhaler.  (R. 198).  She denied headaches.  (R. 198).  Plaintiff's gait and station were normal without assistive devices, and she walked effectively; she had no tenderness of the back, and straight leg testing was negative.  (R. 199).  In the opinion of Dr. Bose, Plaintiff could walk for half an hour and stand for two hours in an eight-hour day, with occasional resting.  (R. 199-200).  After examining Plaintiff, Dr.

---

[1]A GAF score of 41-50 indicates that an individual has serious symptoms OR any serious impairment in social, occupational, or school functioning.

Bose diagnosed COPD, nicotine addiction, degenerative joint disease, and depression.  Dr. Bose concluded that Plaintiff's problems did not affect her activities of daily living, that she could stand continuously for 15 to 20 minutes, and that she had no problems with sitting, hearing, or seeing.  (R. 200).  Dr. Bose concluded that Plaintiff needed lifestyle changes, including quitting smoking to improve lung functioning.  (R. 200).  Dr. Bose also noted that Plaintiff would be having a lung test on the same day as her examination (R. 200); that test revealed moderate obstruction, with one-second forced expiratory volume ("$FEV_1$") of 1.23 before the administration of medication and 1.31 after the administration of medication (R. 194).

Plaintiff was hospitalized from April 14-17, 2007, with complaints of general abdominal pain, bloody diarrhea, and an abnormal CT scan.  (R. 104-12).  It was noted that she had been on a drug study with surveillance endoscopy for approximately three weeks through Medisphere.  (R. 104, 108).  It was noted that she smokes a pack of cigarettes a day and has done so for years.  (R. 108).  Plaintiff underwent a colonoscopy.  (R. 104).  Several polyps were removed and Plaintiff was diagnosed with nonspecific colitis.  (R. 104).

### 2. State Agency Review

On September 26, 2005, James Gange, Ph.D., completed a Psychiatric Review Technique form for the State agency.  (R. 164-77).  Dr. Gange concluded that Plaintiff's mental impairment caused only mild limitations in her activities of daily living and concentration, persistence, or pace, and no limitation in her ability to maintain social functioning.  (R. 174).  He also concluded that Plaintiff

-5-

had experienced no episodes of decompensation.  (R. 174).  Dr. Gange concluded that Plaintiff's mental impairment was not severe.  (R. 164).  In December 2005, Joseph Pressner, Ph.D., affirmed the opinion of Dr. Gange that Plaintiff did not have a severe mental impairment.  (R. 141-54).

Richard Wenzler, M.D., reviewed Plaintiff's file and completed a Physical Residual Functional Capacity Assessment form on September 28, 2005.  (R. 178-85).  Dr. Wenzler opined that Plaintiff could lift and carry ten pounds frequently and 20 pounds occasionally, and that she could sit, stand, and walk for about six hours each during an eight-hour workday.  (R. 179).  Dr. Wenzler indicated that Plaintiff could frequently climb, balance, stoop, kneel, crouch, and crawl. (R. 180).  Plaintiff had no manipulative or vision limitations.  (R. 181).  Plaintiff needed to avoid concentrated exposure to extreme cold or heat, humidity, and fumes, odors, dusts, gases, and poor ventilation.  (R. 182).  Dr. Wenzler remarked that Plaintiff's $FEV_1$ of 1.31 L at her consultative examination represented only a mild exacerbation and was not listing level.  (R. 179). Fernando Montoya, M.D., also reviewed the file and affirmed the opinion of Dr. Wenzler.  (R. 155-62).

### III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *see also Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes

that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400.  Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

## IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she suffers from a "disability" as defined by the Act.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant:  (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy.  *Id.*  The burden of proof is on Plaintiff during

steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V.  The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through March 31, 2010; Plaintiff also had not engaged in substantial gainful activity since the alleged onset date. (R. 13).  The ALJ found that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had two impairments that are classified as severe:  COPD and a history of headaches. (R. 13).  The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 15).  Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of her limitations were not fully credible. (R. 17). Consequently, the ALJ concluded that Plaintiff retained the RFC to lift and/or carry ten pounds frequently and 20 pounds occasionally, sit/stand/walk for six hours in an eight-hour workday, frequently stoop, kneel, crouch, crawl or climb stairs, and never work in concentrated exposures to dust, fumes, gases, or other respiratory irritants. (R. 15).  The ALJ opined that Plaintiff retained the RFC to perform her past work as a scheduler and records clerk. (R. 19).  The ALJ concluded by finding that Plaintiff was not under a disability. (R. 20).

## VI.  Issues

Plaintiff has essentially raised five issues.  The issues are as follows:

1.  Whether Plaintiff's depression was a severe impairment.

-8-

2. Whether Plaintiff's impairments met a listing.

3. Whether the ALJ's credibility determination is patently wrong.

4. Whether the ALJ improperly failed to consider Plaintiff's headaches.

5. Whether the ALJ gave proper weight to Dr. Bose's opinions.

**Issue 1:  Whether Plaintiff's depression was a severe impairment.**

Plaintiff first argues that the ALJ erred by failing to find that her depression was a severe impairment at step two of the five-step evaluation process.  As discussed above, 20 C.F.R. § 404.1520 provides a five-step evaluation process.  Step two of that process involves determining if an individual has a severe impairment.  Step two is simply an initial screening device to eliminate consideration of individuals who have only slight impairments.  *Taylor v. Schweiker,* 739 F.2d 1240, 1243 n.2 (7th Cir. 1984).  As then District Judge David Hamilton indicated, "[a]s long as the ALJ proceeds beyond step two, as in this case, no reversible error could result solely from his failure to label a single impairment as 'severe.'  The ALJ's classification of an impairment as 'severe' or 'not severe' is largely irrelevant past step two.  What matters is that the ALJ considers the impact of all of the claimant's impairments – 'severe' and 'not severe' – on her ability to work."  *Gordon v. Astrue,* 2007 WL 4150328 at *7 (S.D. Ind. 2007).

In this case, while the ALJ failed to conclude that Plaintiff's depression was severe, he did find two other severe impairments and clearly proceeded to the other steps of the five-step evaluation.  The ALJ extensively discusses the Plaintiff's depression, devoting an entire page of findings to that discussion.  (R.

14).  The ALJ expressly states that he evaluated the effects of Plaintiff's mental impairments when assessing Plaintiff's RFC.  (R. 15).  Hence, there was no reversible error at step two.

**Issue 2:  Whether Plaintiff's impairments met a listing.**

Plaintiff also claims that the ALJ erred by failing to conclude that either her COPD met Listing 3.02 or that the combination of all of her impairments met or substantially equaled this listing.  Listing 3.02 for impairments involving chronic pulmonary insufficiency explains that an individual's impairment is of listing-level severity if the individual has "Chronic obstructive pulmonary disease due to any cause, with the $FEV_1$ equal to or less than the values specified in table 1 corresponding to the person's height without shoes."  20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 3.02.  The required $FEV_1$ level corresponding to Plaintiff's height of 65 inches was 1.25.  *Id.*  Plaintiff's testing in September 2005 demonstrated $FEV_1$ of 1.23 before the administration of medication and 1.31 after the administration of medication.  (R. 194).  Therefore, her $FEV_1$ of 1.31 was not "equal to or less than the values in table 1," and her COPD did not meet Listing 3.02.

Plaintiff argues that the two numbers should have been averaged together which would result in a $FEV_1$ value of 1.27 which would place her extremely close to 1.25.  However, Listing 3.00, which is the introduction to all respiratory impairments, explains how to evaluate pulmonary function testing as follows: "The *highest* values of the $FEV_1$ and FVC, whether from the same or different tracings, should be used to assess the severity of the respiratory impairment."

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 3.00 (emphasis added). Therefore, Plaintiff's argument is without merit.

Plaintiff also argues that the ALJ should have determined that her respiratory impairment, in combination with all of her other impairments, met or substantially equaled Listing 3.02. However, Plaintiff's other allegedly severe impairments were depression and a history of headaches, and she has failed to explain in her brief how these two impairments, in combination with her COPD, could have possibly met or substantially equaled Listing 3.02. Neither of these impairments affect pulmonary functioning, so it is difficult to comprehend how they could have edged Plaintiff closer to meeting or substantially equaling this listing. Because Plaintiff's height was 65 inches and her $FEV_1$ was not equal to or less than 1.25, her COPD does not meet or substantially equal Listing 3.02, and the ALJ's decision is supported by substantial evidence.

**Issue 3:    Whether the ALJ's credibility determination is patently wrong.**

Plaintiff also finds fault in the ALJ's assessment of her credibility. An ALJ's credibility determination will not be overturned unless it is "patently wrong." *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). However, here the ALJ's "credibility" decision is not only an analysis of Plaintiff's credibility, but also an evaluation of Plaintiff's complaints of pain. Therefore, the ALJ must consider SSR 96-7p, the regulation promulgated by the Commissioner to assess and report credibility issues, as well as 20 C.F.R. § 404.1529(c)(3).

SSR 96-7p states that there is a two-step process that the ALJ engages in when determining an individual's credibility:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms. If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, *the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.* This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4). These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

SSR 96-7p (emphasis added). SSR 96-7p further provides that the ALJ's

decision regarding the claimant's credibility "must contain specific reasons for

the finding on credibility, supported by the evidence in the case record, and

-12-

must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.*

Moreover, 20 C.F.R. § 404.1529(c)(3) states that when a claimant's subjective individual symptoms, such as pain, are considered, several factors are relevant, including:  (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3)(i)-(vii).

The ALJ's credibility determination was as follows:

After a thorough examination of the claimant's assertions regarding the intensity, persistence, and limiting effects of her alleged symptoms, and all other pertinent evidence within the scope of Social Security Ruling 96-7p and 20 CFR 404.1529, the undersigned finds that her statement concerning the severity and extent of her alleged ongoing exertional and nonexertional limitations and their impact on her ability to work are not fully credible.  The evidence contained in the record does not support the degree of limitations alleged.  The undersigned notes that the claimant left her job as a result of a lay-off rather than her impairments and that she has received no mental health treatment.  The evidence also indicates that the claimant continued to smoke for much of the period at issue, but alleged inability to pay for medications.  To remedy this, the claimant stated that she used her husband's Zoloft.  Although

-13-

the claimant uses inhalers, if her FEV1 and FVC (forced vital capacity) were reduced as testing indicates, one might expect the use of a nebulizer on a regular basis, as well as oxygen or other breathing aids.

(R. 17).

The ALJ, in this case, reasonably concluded that Plaintiff's testimony about the extent of her limitations was not fully credible. Plaintiff argues that the ALJ did not explain what he meant by not "fully" credible. An examination of the ALJ's decision reveals otherwise. The ALJ explained that the evidence in the record did not support the degree of limitations that Plaintiff had alleged in her testimony at the hearing. Some, but not all, of Plaintiff's allegations were supported by the medical record. The ALJ reasonably credited those allegations that were supported by the record and limited Plaintiff to a reduced range of light work.

Plaintiff also found fault in the ALJ's characterization of the amount of treatment she sought for her respiratory impairment, as well as her smoking. First, with regard to Plaintiff's treatment for her COPD, Plaintiff alleges that the ALJ improperly determined that Plaintiff was only seeking conservative treatment (such as an inhaler) for her COPD. However, the court notes that the relevant time period is after December 29, 2004, when Plaintiff alleged her disability began. Since that date, the only reference to more aggressive treatment for Plaintiff's COPD than an inhaler was a statement made by Plaintiff during her mental status exam with Dr. Wilson that she used a "breathing machine." (R. 203). There is no "objective" medical evidence that indicates that Plaintiff regularly sought more aggressive treatment for her COPD. In fact, in

September 2005, Plaintiff admitted to Dr. Bose that her shortness of breath was resolved by use of an inhaler.  (R. 198).  Additionally, during her testimony at the hearing, she mentioned using inhalers, but made no mention of more aggressive treatment.  Hence, the ALJ's finding of Plaintiff not fully credible because she only sought conservative treatment for her COPD is supported by the record.

Second, Plaintiff found fault in the ALJ's decision that Plaintiff was not credible because of her continued smoking.  Plaintiff alleges that she quit smoking in August 2005.  (Plaintiff's Brief in Support of Claim at 13).  The medical records do not support Plaintiff's assertion; records from Tulip Tree reveal that she was advised to quit smoking in November 2006 and January and March 2007.  (R. 117, 119, 121).  And, she admitted to smoking a pack of cigarettes a day in April 2007.  (R. 108).  Therefore, it appears that Plaintiff was not being completely honest about her smoking habit.  The court concludes that the ALJ was justified in pointing out Plaintiff's smoking habit as a rationale for finding her not credible for two reasons:  it shed light on her financial situation, and it undermined her argument about the severity of her COPD.  The one-to-three packs of cigarettes that the objective medical evidence reveals Plaintiff was smoking would have cost her multiple thousand dollars a year; money that could easily have been spent on medical care instead.[2]  The ALJ did not commit error by relying on this as part of his credibility determination.  The ALJ also reasoned that Plaintiff 's COPD must not be as severe as she claimed it to be because she

---

[2]The money spent on cigarettes also explains why the ALJ may not have given credence to Plaintiff's claims that she could not afford more aggressive treatment.

continued to smoke.  This was also not error.  Plaintiff's failure to adhere to recommendations to quit smoking was certainly a factor that the ALJ was permitted to rely upon in making his credibility determination.  For the reasons discussed above, the ALJ's credibility determination was not "patently wrong," and it must be upheld.

**Issue 4:      Whether the ALJ failed to consider Plaintiff's headaches.**

Next, Plaintiff argues that the ALJ improperly failed to consider her headaches.  In his decision, the ALJ noted that Plaintiff had testified that she had a lot of migraines that last several hours and cause nausea and that these headaches happen at least six times a month.  (R. 16).  However, there is no evidence in the record that Plaintiff sought treatment for frequent headaches or that she was ever diagnosed with having migraines.  While there is at least one mention of "frequent headaches" in a treatment note from Tulip Tree in February 2005, since then, in September 2005, Plaintiff denied having headaches to consultative examiner Dr. Bose.  (R. 198).  Plaintiff argues in her Brief that she had testified to using her inhaler every one to one-and-a-half hours, that the directions on her inhaler indicate that use of the inhaler more than once every four hours was not recommended, that one side effect from use of the inhaler could be headaches, and that the ALJ committed error by not addressing Plaintiff's over use of the inhaler and the possibility of headaches as a side effect. However, Plaintiff has not pointed to any objective medical evidence to support her argument.  Absent objective medical evidence that Plaintiff was suffering from headaches as a side effect of the use of her inhaler (and because Plaintiff

has not demonstrated that she even made this argument to the ALJ), the ALJ's decision regarding Plaintiff's headaches is supported by substantial evidence.

**Issue 5:       Whether the ALJ gave proper weight to Dr. Bose's opinions.**

A final argument Plaintiff raises is that the ALJ should have given more weight to the opinions of Dr. Bose, who conducted a consultative exam in September 2005.  Dr. Bose opined that Plaintiff could only walk for a half hour in an eight-hour workday and could only stand for two hours.  The ALJ rejected these opinions, as he believed that they were based on Plaintiff's subjective complaints and not supported by the objective medical evidence.

Opinions of a treating physician are generally entitled to controlling weight.  *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000).  However, an ALJ may reject the opinion of a treating physician if it is based on a claimant's exaggerated subjective allegations, is internally inconsistent, or is inconsistent with other medical evidence in the record.  *Dixon v. Massanari,* 270 F.3d 1171, 1177-78 (7th Cir. 2001).  Additionally, 20 C.F.R. § 404.1527 provides guidance for how the opinions of treating and nontreating sources are to be evaluated and explains as follows:

> (d)  How we weigh medical opinions.  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> > (1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2)  Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i)  Length of the treatment relationship and the frequency of examination.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii)  Nature and extent of the treatment relationship.  Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.  For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her

opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.  When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3)  Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4)  Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5)  Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6)  Other factors.  When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

-19-

*****

(f)  Opinions of nonexamining sources.  We consider all evidence from nonexamining sources to be opinion evidence.  When we consider the opinions of nonexamining sources, we apply the rules in paragraphs (a) through (e) of this section.  In addition, the following rules apply to State agency medical and psychological consultants, other program physicians and psychologists, and medical experts we consult in connection with administrative law judge hearings and Appeals Council review:

> (1)  In claims adjudicated by the State agency, a State agency medical or psychological consultant (or a medical or psychological expert (as defined in § 405.5 of this chapter) in claims adjudicated under the procedures in part 405 of this chapter) will consider the evidence in your case record and make findings of fact about the medical issues, including, but not limited to, the existence and severity of your impairment(s), the existence and severity of your symptoms, whether your impairment(s) meets or equals the requirements for any impairment listed in appendix 1 to this subpart, and your residual functional capacity.  These administrative findings of fact are based on the evidence in your case record but are not themselves evidence at these steps.

20 C.F.R. § 404.1527.

The ALJ's rejection of Dr. Bose's opinions is supported by the record.  The objective medical evidence revealed that Plaintiff had no problems with her legs including normal gait and station, negative straight leg testing, and normal muscle strength.  (R. 199).  Consequently, the only rationale for limiting her to walking for no more than a half hour and standing for two hours would be her COPD.  Yet, Plaintiff informed Dr. Bose that her shortness of breath was resolved with the use of her inhaler.  Given that there were no objective medical tests which revealed that Plaintiff was as severely limited as Dr. Bose opined, and in light of the fact that State agency physicians opined that Plaintiff could stand

and walk for six hours each during an eight-hour workday (R. 179), the ALJ was free to reject Dr. Bose's opinions.

## VII.  Conclusion

The ALJ's decision that Plaintiff's depression was not severe is not reversible error.  The ALJ also reasonably concluded that Plaintiff's impairments did not meet a listing.  Additionally, the ALJ conducted a thorough credibility determination.  And, the ALJ's treatment of Dr. Bose's opinions is supported by the objective medical evidence.  Finally, the objective medical evidence supports the conclusion that Plaintiff's headaches did not impact her RFC.  The final decision of the Commissioner is, therefore, **AFFIRMED.**

**SO ORDERED** the 26th day of April, 2010.

William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**Electronic copies to:**

Eric Joseph Yocum
eric_yocum@msn.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov